# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  60310-1-II |
| Respondent, | |
| v. | |
| T.M., | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Following a bench trial, T.M.[1] appeals his guilty adjudication for third degree rape.  Specifically, T.M. argues that the juvenile court erred when it admitted a statement he made to law enforcement following his arrest because law enforcement failed to inform him of his right to an attorney in violation of CrR 3.1[2] and RCW 13.40.740.  T.M. also argues that the juvenile court erred when it admitted hearsay testimony from a sexual assault nurse examiner (SANE) under ER 803(a)(4) because the statements were not reasonably related to medical diagnosis or treatment.

---

[1]  T.M. passed away after this appeal was filed.  T.M.'s father, Randy Miller, moved to substitute for T.M.  We granted Miller's motion.  To avoid confusion, this opinion will refer to T.M. as the appellant.

[2]  While this case involves a juvenile offense proceeding, the parties only argue CrR 3.1 in their appellate briefing.  JuCR 1.4(b) states that the "Superior Court Criminal Rules shall apply in juvenile offense proceedings when not inconsistent with" the juvenile court rules and applicable statutes.  CrR 3.1 is not inconsistent with JuCR 9.2(d), which addresses the provision of a lawyer at public expense in a juvenile offense proceeding.

Because T.M. did not raise CrR 3.1 when he objected to the admission of his statement to law enforcement,[3] he has failed to preserve the issue for review and his CrR 3.1 challenge has been waived. Additionally, because a juvenile's spontaneous statements are admissible under RCW 13.40.740(3)(c), there has been no violation of RCW 13.40.740. Finally, because the record shows that statements made to the SANE were to promote medical treatment and the SANE relied on those statements to provide medical treatment, the juvenile court did not err when it admitted the SANE's testimony under ER 803(a)(4). Accordingly, we affirm.

FACTS

A.    BACKGROUND

On October 21, 2022, a Friday, 16-year-old Y.I.[4] and her friend, D.M., planned for Y.I. to spend the night at D.M.'s home. D.M. had a 14-year-old brother, T.M. Y.I. had been friends with D.M. since elementary school and had known T.M. for years through D.M.

Approximately one month earlier, Y.I. and T.M. dated for about a week. T.M. ended the relationship with Y.I. When Y.I. agreed to spend the night at D.M.'s home, she did not know that T.M. was going to be present. It was the first time Y.I. had ever spent the night at D.M.'s house. Joseph Stevens, D.M.'s mother's boyfriend, was also present in the house.

During the evening of October 21, Y.I. and D.M. primarily stayed in D.M.'s room watching movies on her bed and using their phones. T.M. went in and out of D.M.'s room, socializing with

---

[3] Nor did T.M. raise JuCR 9.2(d).

[4] We use initials to protect the privacy of child victims and witnesses. Gen. Ord. 2023-2 of Div. II, *Using Victim Initials* (Wash. Ct. App.), https://www.courts.wa.gov/appellate_trial_courts/.

both D.M. and Y.I. At one point in the evening, T.M. sat with D.M. and Y.I. on the bed underneath a blanket. D.M. was on her phone while T.M. and Y.I. chatted.

Underneath the blanket, T.M. placed his hand on Y.I.'s inner thigh and on her genitals. According to Y.I., she kicked T.M.'s hand away because she did not want him to touch her. However, she did not say anything to T.M. because D.M. was nearby and Y.I. did not want D.M. to get mad at T.M. According to T.M., Y.I. did not say anything or use any body language to indicate she did not wish to be touched. D.M. did not notice anything between Y.I. and T.M.

T.M. started communicating with Y.I. by typing out messages on her phone and the two passed her phone back and forth. T.M. and Y.I. typed out messages about their relationship and T.M. explained why he ended the relationship.

According to T.M., the conversation steered to a more sexual nature, which Y.I. had instigated. Then, T.M. and Y.I. made a plan for Y.I. to go to T.M.'s room later that night "to continue what [they] had started . . . in the bedroom" when T.M. had his hand on Y.I.'s thigh. Verbatim Rep. of Proc. (VRP) (Feb. 20, 2024) at 304. According to Y.I., T.M. asked Y.I. to come to his room later so they could talk more about their relationship. Y.I. no longer had any interest in being in a relationship with T.M.

After D.M. fell asleep, Y.I. went to the bathroom. To do so, she passed by Stevens' room; the door was open, and Stevens was sitting on the edge of his bed playing a video game. Stevens wore a headset over one ear and spoke with other online players. However, Stevens left one ear uncovered so he could hear things happening in the house. Stevens saw Y.I. pass by his bedroom and assumed she was going to the bathroom.

3

After Y.I. went to the bathroom, she went to T.M.'s room. According to Y.I., she stood in the doorway and asked T.M. what he wanted to talk about. T.M. walked up to Y.I. and pulled her "lightly" into his room even though she did not wish to enter. VRP (Feb. 20, 2024) at 126. Y.I. did not say anything. The door to T.M.'s bedroom was still open.

T.M. began kissing her, and Y.I. asked that he stop. T.M. then pulled her towards his bed and said they could "just talk." VRP (Feb. 20, 2024) at 128. They chatted briefly.

T.M. sat next to Y.I. on the bed and "used his body weight and pushed [her] further onto the bed." VRP (Feb. 20, 2024) at 129. Y.I. verbalized that she did not want to be in that position. T.M. told Y.I., "[I]t'll be fine," and used his body weight to lay down on top of Y.I. VRP (Feb. 20, 2024) at 130. Y.I. attempted to move him off her but was unable to. T.M. pulled off Y.I.'s sweatshirt and underwear. He pulled down his own shorts enough to then insert his penis into her vagina. T.M. did not use a condom.

Y.I. was finally able to move T.M.'s body off her. She grabbed her clothes, dressed, and left his room. Y.I. passed back by Stevens' room, where he was still playing his video game. Stevens saw Y.I. walk back towards D.M.'s room and noted it was approximately 45 minutes after he first saw her walk to the bathroom. D.M. was asleep, and Y.I. did not want to wake up D.M.

According to T.M., when Y.I. came to his room, she walked in and sat on the edge of his bed. They chatted about their relationship and the conversation again turned to a more sexual nature. Then, Y.I. kissed T.M. and laid down on his bed. Y.I. took off her clothes and the two engaged in sexual intercourse. T.M. did not perceive any resistance from Y.I. nor did he ever hear her say no. Afterwards, Y.I. dressed and left his room. At no point during the encounter did T.M. believe he did not have her consent.

After Y.I. returned to D.M.'s room, she texted another friend about the incident. Y.I. then reported the incident in further detail to that friend in person the following day.

According to Y.I., she had been crying and upset, and she told D.M. what happened the morning after the incident. D.M. recalled that Y.I. did not disclose she had been assaulted the morning after the incident and Y.I. seemed "happy" and her normal self. VRP (Feb. 20, 2024) at 213. Only after Y.I. left did Y.I. text D.M. about the incident. D.M. told Y.I. that she would tell her parents and that she would "deal with it." VRP (Feb. 20, 2024) at 138. Later that week, D.M. contacted her school's resource officer, Officer Phillip Anderson, and informed him about what Y.I. told her. While D.M. did not know what to believe, she believed the allegation was "a serious thing" and "should be brought up to an adult." VRP (Feb. 20, 2024) at 214.

On October 23, Y.I. disclosed the incident to her parents. Y.I.'s parents contacted law enforcement, and on October 24, they took Y.I. to the hospital for a sexual assault exam. Between the incident and the sexual assault exam, Y.I. had brushed her teeth and showered twice.

Anne Houran, the SANE, examined Y.I. Nurse Houran did not discover any physical injuries on Y.I. At Nurse Houran's recommendation, Y.I. took "Plan B" to prevent pregnancy and "a few other pills to make sure [she] didn't have any [sexually transmitted diseases]." VRP (Feb. 20, 2024) at 140.

B.    CASE HISTORY

1.    Arrest and Spontaneous Statement

The State charged T.M. with second degree rape, or "sexual intercourse by forcible compulsion." Clerk's Papers (CP) at 3. The week following the incident between Y.I. and T.M., a detective contacted Officer Anderson and asked him to take T.M. into custody. Two security

officers pulled T.M. from his class and escorted him to Officer Anderson's office. Officer Anderson then informed T.M. that he was under arrest, placed T.M. in handcuffs, and drove him to the Battle Ground Police Department. Officer Anderson did not provide any *Miranda*[5] warnings when he placed T.M. under arrest, and he did not inform T.M. as to why T.M. was under arrest.

Officer Anderson pulled into the police department parking lot and transferred custody of T.M. to a detective. T.M. did not say anything on the drive to the police department, nor did Officer Anderson ask any questions. As Officer Anderson transferred custody of T.M. to the detective, Officer Anderson overheard the detective mention to T.M. the rape charge, but Officer Anderson did not hear anything further.

Approximately 10 minutes later, the detective returned with T.M. for Officer Anderson to book T.M. into a holding cell. Officer Anderson did not speak with T.M. During the booking process, T.M. stated, "Women are a lot of trouble." VRP (Feb. 20, 2024) at 250.

2.    CrR 3.5 Hearing

The juvenile court held a CrR 3.5 hearing on the admissibility of T.M.'s statement that "women are a lot of trouble." Officer Anderson testified regarding T.M.'s arrest. Through Officer Anderson, the State attempted to introduce T.M.'s statement, "Women are a lot of trouble." VRP (Feb. 20, 2024) at 250. The State did not present any other witnesses regarding T.M.'s statement.

T.M. objected to the introduction of his statement, arguing that it was the State's burden to demonstrate the admissibility of the statement and there was insufficient evidence that T.M. had been properly advised of his *Miranda* rights prior to making the statement. The State argued that

---

[5] *See generally Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

while T.M. was in custody, there was no interrogation, and it was not seeking to admit any statements made in response to a custodial interrogation; rather, T.M.'s statement was spontaneous.

The juvenile court acknowledged that T.M. was in custody and that there was no evidence T.M. had been provided with *Miranda* rights or juvenile waivers. However, the juvenile court found that T.M.'s statement was spontaneous, and therefore admissible.

The juvenile court issued written findings of fact (FOF) and conclusions of law (COL). The COLs stated, in relevant part:

> 2.  [T.M.] did not make a statement in response to any police questioning by law enforcement. His statement was not the product of an interrogation by law enforcement. *State v. Ortiz,* 104 Wn.2d 479, 484, 70[6] P.2d 1069 (1985); *Miranda v. Arizona,* 384 U.S. 436, 478 (1966).
>
> 3.  [T.M.]'s statement to law enforcement was freely and voluntarily given and it qualifies as a spontaneous statement. *Miranda v. Arizona,* 384 U.S. 436, 478 (1966).
>
> 4.  [T.M.]'s statement is admissible in the State's case-in-chief.

CP at 42 .

### 3.  Trial

The case proceeded to a two-day bench trial. Several witnesses, including Y.I. and T.M., testified to the facts described above.

#### a.  SANE testimony

Nurse Houran testified about Y.I.'s sexual assault exam. Nurse Houran stated that the purpose of an exam is to collect evidence and to provide medical care through making recommendations on follow-up treatments for a patient. Nurse Houran stated that asking a patient

about the type of sexual contact and whether that contact was consensual is relevant to her consideration of the risk of sexually transmitted infections and other prophylactic recommendations. Following Nurse Houran's exam of Y.I., Nurse Houran made a report.

The State sought to admit details of Nurse Houran's report under ER 803(a)(4), the medical hearsay exception.[6] T.M. objected because Nurse Houran's report included hearsay statements from Y.I. regarding the nature of Y.I.'s encounter with T.M. T.M. argued that Nurse Houran's report was "clearly an evidence gathering process[, and] not for medical treatment per se." VRP (Feb. 20, 2024) at 185.

The juvenile court overruled T.M.'s objection. The juvenile court stated that the contents of Nurse Houran's report were for medical treatment because "she's providing recommendations as to the prophylactics for . . . sexually transmitted disease and also [Y.I.] testified she took Plan B at the recommendation [of Nurse Houran]. . . . [T]he [medical hearsay] exception is very well established and I'm going to overrule the objection at this time." VRP (Feb. 20, 2024) at 185-86.

Nurse Houran testified that she asked Y.I. "what happened." VRP (Feb. 20, 2024) at 187. Nurse Houran stated that Y.I. told her T.M. had pushed Y.I. down onto the bed, held her by the

---

[6] ER 803(a)(4) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
>     . . . .
>
>     . . . Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

8

neck, and engaged in vaginal intercourse with her. Nurse Houran further testified that Y.I. had told T.M. "she didn't want to do anything sexual and she had asked him to stop but he wouldn't." VRP (Feb. 20, 2024) at 188.

b. Closing arguments and verdict

During closing arguments, the State argued that T.M. committed second degree rape "using force to overcome physical resistance to perpetrate . . . this crime." VRP (Feb. 21, 2024) at 342. In the alternative, the State argued T.M. committed "the lesser included crime of Rape in the Third Degree . . . sexual intercourse without consent." VRP (Feb. 21, 2024) at 342.

The juvenile court found Y.I.'s testimony more credible than T.M.'s testimony. While the court did not find the elements of second degree rape beyond a reasonable doubt, the juvenile court found T.M. guilty of third degree rape:

> Basically when I looked at the evidence of [Y.I.'s] testimony I do find her credible [and] that this was not a consensual sexual act. Uh, a number of things support that, the open doors, the no condom, her reporting it immediately, the fear of [sexually transmitted diseases] and needing Plan B because of [sic] no condom was used. . . .
>
> But looking at the testimony and what I'm required to find for Rape in the Second Degree is that the intercourse occurred by forcible compulsion versus Rape in the Third Degree that she did not consent and that the consent was clearly expressed by words and conduct and I believe that there is not proof beyond a reasonable doubt of Rape 2 and I find him not guilty of that and am finding him guilty of Rape in the Third Degree.

VRP (Feb. 21, 2024) at 366-67.

The juvenile court sentenced T.M. to 15 days of detention, 40 hours of community service, and 12 months of community supervision.

T.M. appeals.

No. 60310-1-II

ANALYSIS

On appeal, T.M. argues that his right to an attorney under RCW 13.40.740 and CrR 3.1 was violated, and accordingly the juvenile court erred when it admitted the statement he made to Officer Anderson following his arrest. T.M. also asserts the juvenile court erred when it admitted Nurse Houran's testimony regarding Y.I.'s version of events because it did not fall under a hearsay exception. We disagree.

A. ADMISSIBILITY OF T.M.'S STATEMENT

1. Legal Principles

Under the Fifth Amendment, "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V; *State v. Butler*, 34 Wn. App. 2d 614, 621, 570 P.3d 383, *review denied*, 5 Wn.3d 1021 (2025). Similarly, article I, section 9 of the Washington Constitution provides, "No person shall be compelled in any criminal case to give evidence against himself." The protection found in article I, section 9 is coextensive with that provided by the Fifth Amendment. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008). Additionally, juveniles possess the same right against self-incrimination. RCW 13.40.140(8).

Prior to custodial interrogations, law enforcement must provide an individual with *Miranda* warnings. *Miranda*, 384 U.S. at 444. *Miranda* warnings include informing a person of his or her right to an attorney and the right to remain silent. *Id.*; *State v. Gardner*, 32 Wn. App. 2d 320, 338, 556 P.3d 186 (2024); U.S. CONST. amend. V, amend VI. These rights attach, however, only when a custodial interrogation begins. *State v. Templeton*, 148 Wn.2d 193, 208, 59 P.3d 632 (2002); *State v. D.R.*, 84 Wn. App. 832, 836, 930 P.2d 350, *review denied*, 132 Wn.2d 1015 (1997). A custodial interrogation is generally defined as "questioning initiated by . . . officers after a person

10

is taken into custody." *Templeton*, 148 Wn.2d at 208; *D.R.*, 84 Wn. App. at 836 ("The *Miranda* safeguards apply 'as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest.'" (internal quotation marks omitted) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984))).

Washington's CrR 3.1, which discusses the right to an attorney, goes beyond constitutional requirements. *Templeton*, 148 Wn.2d at 211.[7] Under CrR 3.1(b)(1), "[t]he right to a lawyer shall accrue *as soon as feasible* after the defendant is taken into custody." (Emphasis added.) Further,

> [w]hen a person is taken into custody that person *shall immediately* be advised of the right to a lawyer. Such advice shall be made in words easily understood, and it shall be stated expressly that a person who is unable to pay a lawyer is entitled to have one provided without charge.

CrR 3.1(c)(1). CrR 3.1 has two purposes: first, to ensure that arrested individuals are aware of their right to counsel "'before they provide evidence which might tend to incriminate them.'" *Templeton*, 148 Wn.2d at 217 (internal quotation marks omitted) (quoting *State v. Templeton*, 107 Wn. App. 141, 147, 27 P.3d 222 (2001), *rev'd*, 148 Wn.2d 193, 59 P.3d 632 (2002)). Second, the rule ensures "that persons arrested know of their right to counsel in time to decide whether to acquire exculpatory evidence." *Id.* "Where there is a violation of the court rule right to counsel, the remedy is suppression of evidence tainted by the violation." *State v. Copeland*, 130 Wn.2d 244, 282, 922 P.2d 1304 (1996).

Washington also statutorily mandates that juveniles must have access to an attorney before the juvenile waives any constitutional rights. RCW 13.40.740. RCW 13.40.740 states:

---

[7] *Templeton* discusses CrRLJ 3.1; however, "CrR 3.1 for Superior Courts is identical in language and likewise is implicated by this decision." 148 Wn.2d at 200 n.7.

     (1) Except as provided in subsection (4) of this section, law enforcement shall provide a juvenile with access to an attorney for consultation, which may be provided in person, by telephone, or by videoconference, before the juvenile waives any constitutional rights if a law enforcement officer:
          (a) Questions a juvenile during a custodial interrogation;
          (b) Detains a juvenile based on probable cause of involvement in criminal activity; or
          (c) Requests that the juvenile provide consent to an evidentiary search of the juvenile or the juvenile's property, dwellings, or vehicles under the juvenile's control.
          (2) The consultation required by subsection (1) of this section may not be waived.

Washington courts have interpreted the "constitutional rights" in RCW 13.40.740(1) to mean a juvenile's *Miranda* rights that must be given prior to a custodial interrogation. *State v. Luna*, 5 Wn.3d 465, 486, 578 P.3d 273 (2025) ("RCW 13.40.740 provides a specific consequence that flows from *interrogating a juvenile* without first providing them access to an attorney for consultation: the statements made in the interrogation will generally be inadmissible." (Emphasis added)).

Generally, "[s]tatements made by a juvenile after the juvenile is contacted by a law enforcement officer in a manner described under subsection (1) of this section are not admissible in a juvenile offender or adult criminal court proceeding." RCW 13.40.740(3). However, a juvenile's statements may be admissible if:

          (a) The juvenile has been provided with access to an attorney for consultation; and the juvenile provides an express waiver knowingly, intelligently, and voluntarily made by the juvenile after the juvenile has been fully informed of the rights being waived as required under RCW 13.40.140;
          (b) The statement is for impeachment purposes; or
          (c) The statement was made spontaneously.

RCW 13.40.740(3).

"Generally, appellate courts do not consider unpreserved errors raised for the first time on appeal." *State v. Munoz-Hernandez*, 35 Wn. App. 2d 127, 138, 574 P.3d 136, *review denied*, 5 Wn.3d 1024 (2025); RAP 2.5(a). The purpose of RAP 2.5 "is to encourage the efficient use of judicial resources by ensuring that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *State v. Lindsey*, 177 Wn. App. 233, 247, 311 P.3d 61 (2013), *review denied*, 180 Wn.2d 1022 (2014). However, a party may raise a manifest error affecting a constitutional right for the first time on appeal. RAP 2.5(a)(3). To be a manifest constitutional error, a defendant must show "that (1) the issue affects an individual's constitutional rights *and* (2) they suffered actual prejudice." *State v. Lee*, 5 Wn.3d 734, 750, 582 P.3d 271 (2026) (emphasis in original).

2.       CrR 3.1 Challenge Waived

T.M. argues the juvenile court abused its discretion when it admitted his statement, "women are a lot of trouble," because when he made the statement, he had not been advised of his right to an attorney, in violation of CrR 3.1. T.M. asserts the juvenile court applied the incorrect legal standard when considering the admissibility of his statement—specifically, the juvenile court should have considered the statement's admissibility under the lens of CrR 3.1 rather than under *Miranda*.

In response, the State acknowledges that under CrR 3.1, T.M. should have been informed of his right to an attorney immediately following his arrest; however, the State argues T.M.'s challenge is waived because he failed to raise CrR 3.1 at the juvenile court or present any RAP 2.5 argument in his opening brief. We agree with the State.

Here, the record shows that when Officer Anderson arrested T.M., Officer Anderson informed T.M. he was under arrest, placed him in handcuffs, and drove him to the Battle Ground Police Department. There is no dispute that T.M. was in custody. Officer Anderson did not advise T.M. of his *Miranda* rights or that he had the right to an attorney. Additionally, there is no evidence in the record that the detective at the police station informed T.M. of his rights either. Nevertheless, the record is clear that neither Officer Anderson nor the detective questioned T.M. or engaged in any form of interrogation.

CrR 3.1(c)(1) provides that "[w]hen a person is taken into custody that person *shall immediately be advised* of the right to a lawyer." (Emphasis added.) This right accrues "as soon as feasible after the defendant is taken into custody." CrR 3.1(b)(1). Thus, because T.M. was in custody, his right to counsel under CrR 3.1 had accrued. CrR 3.1. Furthermore, and as the State concedes, because T.M. was not advised of his right to an attorney immediately upon his arrest, there was a violation of CrR 3.1. CrR 3.1(c)(1).

However, during the CrR 3.5 hearing, when T.M. objected to the admission of his statement, he objected on the basis of the officers' failure to provide *Miranda* warnings. T.M. did not raise an objection based on CrR 3.1. Accordingly, the juvenile court ruled on the objection based on *Miranda*. The juvenile court did not have an opportunity to address CrR 3.1. *Lindsey*, 177 Wn. App. at 247.

CrR 3.1 is a rule-based right. CrR 3.1(b)(1), (c)(1); *Templeton*, 148 Wn.2d at 218. And here, because law enforcement had not engaged in a custodial interrogation, T.M.'s *constitutional* right to an attorney had not yet attached. *Templeton*, 148 Wn.2d at 208; *D.R.*, 84 Wn. App. at 836. Thus, in this circumstance, the violation of CrR 3.1 does not affect T.M.'s constitutional rights.

*See Lee*, 5 Wn.3d at 750. Therefore, because T.M.'s constitutional rights are not implicated, T.M. fails to demonstrate a manifest constitutional error. *Id.*; RAP 2.5(a)(3).

Accordingly, because T.M. failed to preserve the issue for review and fails to demonstrate a manifest constitutional error, we decline to review his CrR 3.1 challenge to the admissibility of his statement.

3.      No Violation of RCW 13.40.740

T.M. also argues his statement should not have been admissible based on violation of RCW 13.40.740. We disagree.

RCW 13.40.740(1)(b) provides that "law enforcement shall provide a juvenile with access to an attorney for consultation . . . before the juvenile waives any constitutional rights if a law enforcement officer . . . [d]etains a juvenile based on probable cause of involvement in criminal activity." The record shows that T.M. was detained based on probable cause of criminal activity. Thus, under RCW 13.40.740(1), law enforcement was required to provide T.M. with access to an attorney before T.M. waived any of his constitutional rights—or in other words, his *Miranda* rights. *Luna*, 5 Wn.3d at 486.

After a juvenile has been detained and law enforcement seeks a waiver of the juvenile's constitutional rights, any statements the juvenile makes are presumptively inadmissible, *except in certain circumstances*. RCW 13.40.740(3); *Luna*, 5 Wn.3d at 486. One of those circumstances is if the juvenile makes the statement spontaneously. RCW 13.40.740(3)(c). Here, the record shows that during the booking process, T.M. stated, "Women are a lot of trouble." VRP (Feb. 20, 2024) at 250. T.M.'s statement was not in response to any comment or conversation, and the record shows Officer Anderson had said nothing to T.M. Thus, there was no custodial interrogation.

T.M.'s statement was spontaneous. Accordingly, it was admissible based on RCW 13.40.740(3)(c).

T.M. argues "[t]he fact that spontaneous statements are admissible under RCW 13.40.[7]40(3)(c) does not change the analysis in this case" because his spontaneous statement "was made long after T.M. should have been advised of his right to consult with an attorney and his right to remain silent." Br. of Appellant at 16. However, T.M. points to no legal authority supporting this proposition.

As discussed above, law enforcement was not yet required to provide T.M. *Miranda* warnings because there was no custodial interrogation. *Butler*, 34 Wn. App. 2d at 621. There is no evidence in the record to show that either Officer Anderson or the detective asked questions of T.M. or attempted to elicit responses from T.M. regarding his arrest. RCW 13.40.740 "requires juveniles to be offered counsel prior to an *interrogation*." *Luna*, 5 Wn.3d at 483 (emphasis added). Thus, because RCW 13.40.740(1) applies prior to a custodial interrogation and a juvenile's waiver of his or her *Miranda* rights, and because T.M.'s statement was spontaneous and not in response to any question or comment from law enforcement, there was no violation of RCW 13.40.740.

B.    HEARSAY

    1.    Legal Principles

A trial court's evidentiary decisions are reviewed for abuse of discretion. *State v. Wasuge*, 5 Wn.3d 877, 887, 582 P.3d 320 (2026). "An abuse of discretion occurs when the decision was manifestly unreasonable or based on untenable grounds or reasons." *State v. Cecil*, 34 Wn. App. 2d 569, 586, 571 P.3d 1255 (2025).

Generally, hearsay is inadmissible. ER 802. However, there are several exceptions in which hearsay may be admissible. ER 803(a). One such exception is statements made for the purpose of medical diagnosis or treatment. ER 803(a)(4). Under ER 803(a)(4), hearsay is admissible if it includes:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

In assessing whether statements are admissible under ER 803(a)(4), courts consider "the subjective purposes of both the declarant and the medical professional." *State v. Burke*, 196 Wn.2d 712, 740, 478 P.3d 1096, *cert. denied*, 142 S. Ct. 182 (2021). The declarant's motive in making a statement "must be to promote treatment and the medical professional must have relied on it for the purposes of treatment." *Id.*

Generally, statements attributing fault are inadmissible. However, if the declarant discloses the identity of the perpetrator, it "may be reasonably pertinent to treatment in certain situations like domestic violence or sexual abuse 'because part of reasonable treatment and therapy is to prevent recurrence and future injury.'" *Id.* at 740-41 (quoting *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007)).

2.      No Abuse of Discretion

T.M. argues that the juvenile court erred when it allowed Nurse Houran "to fully recite [Y.I.]'s . . . account of the event, ascribing fault to T.M." Br. of Appellant at 22. Specifically, T.M. asserts that Nurse Houran's testimony that Y.I. did not give consent and how Y.I. "ended up

17

in T.M.'s bed" was not related to medical diagnosis or treatment. Br. of Appellant at 22. We disagree.

Here, Nurse Houran testified regarding the process of a sexual assault exam. She testified that asking a patient about the type of sexual contact and whether that contact was consensual is relevant to her consideration of the risk of sexually transmitted infections and other prophylactic recommendations. Nurse Houran further testified that for the purposes of medical treatment, she asked Y.I. the open-ended question, "what happened." VRP (Feb. 20, 2024) at 187. The record shows that Y.I.'s description of events to Nurse Houran was the starting point of the medical exam. *Burke*, 196 Wn.2d at 741. Because Y.I. indicated she did not give her consent, Nurse Houran recommended that Y.I. take prophylactic medications to prevent pregnancy or infection. Y.I. testified, "I ended up taking a Plan B just in case because I didn't know. I took a few other pills to make sure I didn't have any [sexually transmitted diseases]." VRP (Feb. 20, 2024) at 140.

How Y.I. ended up on T.M.'s bed is also relevant to Nurse Houran's physical exam of Y.I. Nurse Houran testified that she conducted a physical exam of Y.I. The record shows that Y.I.'s account directed Nurse Houran's physical exam. For instance, based on Y.I.'s account of vaginal penetration, Nurse Houran examined Y.I.'s external genitalia for injuries. Nurse Houran considered conducting a speculum exam, but as Y.I. had never yet had a pap smear, Nurse Houran chose not to. Nurse Houran also examined Y.I. for injuries generally, but she did not find any. Nurse Houran testified that Y.I. never indicated she had been strangled or could not breathe when T.M. held her by the neck. Based on the evidence presented, the record shows that Y.I.'s statements were made for the purpose of medical treatment.

No. 60310-1-II

Because the record shows that Y.I.'s statements to Nurse Houran were to promote medical treatment, and that Nurse Houran relied on those statements to provide medical treatment and make recommendations, the juvenile court did not abuse its discretion in admitting Nurse Houran's testimony about Y.I.'s version of events under ER 803(a)(4). *Burke*, 196 Wn.2d at 742. Accordingly, we affirm the juvenile court.

CONCLUSION

We affirm T.M.'s guilty adjudication for third degree rape.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Glasgow, J.